Arthur C. KAPPELMANN et al., Appellants,

v.

DELTA AIR LINES, INC., a corporation, et al.

No. 75–1830.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 17, 1975.

Decided April 16, 1976.

Rehearing Denied July 12, 1976.

Landon Gerald Dowdey, Washington, D. C., with whom Laurence Sarezky and Lois Goodman, Washington, D. C., were on the brief for appellants.

Robert Reed Gray, Washington, D. C., with whom John E. Gillick, Jr., Washington, D. C., was on the brief for appellee, Delta Air Lines, Inc.

Mary Elizabeth Medaglia, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry and Paul M. Tschirhart, Asst. U. S. Attys., Washington, D. C., were on the brief for Federal appellees.

Before LEVENTHAL and MacKINNON, Circuit Judges, and McMILLAN,* United States District Judge for the Western District of North Carolina.

Opinion for the court filed by Circuit Judge MacKINNON.

MacKINNON, Circuit Judge:

■ This case grows out of the possible exposure of appellant Arthur C. Kappelmann to radiation leaking from an improperly shielded container that was carried in the cargo section of a commercial airliner on which appellant traveled from Washington, D.C. to Atlanta, Georgia on April 5, 1974.[1] Although Mr. Kappelmann was apparently unaware of the radiation danger during the flight, he was contacted several days thereafter by Delta Air Lines' representatives, informed of the incident, and asked to consult a physician at Delta's expense. No allegation of any ill effects appears in the record, but appellant maintains that he is still under medical observation.[2]

On November 18, 1974, Mr. Kappelmann and his wife[3] filed suit seeking damages against Delta and Value Engineering Co. (the shipper), and temporary and permanent injunctive relief against Delta. The suit also named the Department of Transportation, the Civil Aeronautics Board, and the Federal Aviation Administration [hereafter referred to collectively as the federal defendants] as parties defendant.

On July 8, 1975, the trial judge issued an order (1) dismissing the complaint against the federal defendants on the grounds that no relief was sought against them; (2) dismissing the injunctive relief counts of the complaint; and (3) denying plaintiffs' motion for partial summary injunctive judgment or, in the alternative, for a preliminary injunction. This appeal followed.

I.

The federal defendants in this case have moved to dismiss that portion of the appeal which seeks to reinstate the complaint against them, contending that the ruling of the trial judge was neither a "final decision" within the meaning of 28 U.S.C. § 1291 (1970), nor an appealable interlocutory order under any existing exception to the final judgment rule, and thus that this court has no jurisdiction to hear the appeal as to them. We agree, and grant the motion to dismiss as to these appellees.

■ As a general rule, an order of the district court may be appealed only if it is a

* Sitting by designation pursuant to 28 U.S.C. § 292(d).

1. For a detailed account of the incident, *see* Special Subcomm. on Investigations of the House Comm. on Interstate and Foreign Commerce, 93d Cong., 2d Sess., Report on Air Safety: Selected Review of FAA Performance 179–80 (December 1974).

2. Appellants' Brief at 7.

3. Although appellants contend in their brief that the district court dismissed a "class action claim for injunctive relief" against Delta, there is no evidence in the record that appellants ever sought, or obtained, a certification of class action, nor does it appear that they have complied with the requirements for class actions set forth in Rule 1–13 of the Rules of United States District Court for the District of Colum-

bia. Rule 1–13 requires that (a) "[i]n any case sought to be maintained as a class action, the complaint shall contain specified information under a separate heading styled 'Class Action Allegations'," and (b) "[w]ithin 90 days after the filing of a complaint in a case sought to be maintained as a class action, the plaintiff shall move for a certification under Rule 23(c)(1), Federal Rules of Civil Procedure, that the case be maintained as a class action." In view of the fact that plaintiffs have never done either (a) or (b), it seems clear that this case is not a class action. Moreover, a request for certification of the *Penna* case (arising out of the same incident as is the subject of this litigation) as a class action was denied by District Judge Hart on November 6, 1974. *Penna v. Value Engineering Co.,* Civ. No. 74–704 (D.D.C.).

"final decision." 28 U.S.C. § 1291 (1970). A final decision is defined as "one which ends the litigation on the merits and leaves nothing for the court to do but execute the judgment." *Catlin v. United States,* 324 U.S. 229, 233, 65 S.Ct. 631, 633, 89 L.Ed. 911, 916 (1945). Here, the litigation over damages continues, with only the number of parties having been reduced (and the injunctive relief aspects of the suit eliminated). In such a case involving multiple parties, Fed.R.Civ.P. 54(b) provides:

> [T]he court may direct the entry of a final judgment as to one or more but fewer than all of the . . . parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates . . . the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the . . . parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating . . . the rights and liabilities of all the parties.

No such express determination and direction was made in this case, and hence an appeal premised on section 1291 must be dismissed. *Turtle v. Institute for Resource Management, Inc.,* 154 U.S.App.D.C. 341, 342, 475 F.2d 925, 926 (1973); 6 J. Moore, Federal Practice ¶¶ 54.28[2], 54.34[2.–2] (rev. 2d ed. 1975).

The only exception to this rule which is possibly relevant on the facts now before us[4] is that provided by 28 U.S.C. § 1292(a)(1) (1970), which authorizes appeals from interlocutory orders of the district court "granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions." *See generally* 6 J. Moore, *supra* at ¶ 54.30[2.–1]. Since no injunctive relief was sought against the federal defendants, however, section 1292(a)(1) cannot provide this court with jurisdiction to hear this part of the appeal.

The federal defendants' motion to dismiss the appeal as to them is therefore granted.

## II.

The remaining questions concern the district court's disposition of the requests for injunctive relief. Count 11(4) of the appellants' complaint requested

> 4) That this court grant temporary and permanent injunctive relief against defendant airline requiring it to give adequate warning of the presence of a significant amount of radioactive materials to (a) all prospective passengers who may be boarding airplanes operated as passenger flights by it and carrying a significant amount of radioactive materials; or, in the alternative (b) all prospective passengers who may be boarding airplanes operated as passenger flights by it and carrying a significant amount of radioactive materials, which passengers have been exposed previously to a significant amount of radiation.

(J.App. 10). The district court dismissed this request for relief chiefly on the ground that the doctrine of primary jurisdiction requires that resort first be made to the administrative agency for relief.

"The precise function of the doctrine of primary jurisdiction is to guide a court in determining whether the court should re-

---

4. Appellants appear to make this argument in propounding a confused theory that failure to obtain a Rule 54(b) certificate "is of no practical consequence" since "the order denying preliminary injunction is ripe for review," citing *Pang-Tsu Mow v. Republic of China,* 91 U.S. App.D.C. 324, 326–27, 201 F.2d 195, 197–98 (1952) *cert. denied* 345 U.S. 925, 73 S.Ct. 784, 97 L.Ed. 1356 (1953). Appellants' Reply Br. at 6. The *Pang* case, however, merely observed that no preliminary injunction (which had been granted by the district court in that case) can stand if the complaint itself was faulty, and that therefore an appellate court may, when reviewing the grant of a preliminary injunction, inquire into both the jurisdiction of the district court and the adequacy of the complaint. In the present case there was no injunction sought against the federal defendants, so the fundamental basis for appellate jurisdiction, present in *Pang,* is absent here.

frain from exercising its jurisdiction until after an administrative agency has determined *some question* or some aspect of some question arising in the proceeding before the court." 3 K. Davis, Administrative Law Treatise § 19.01 (1958) (emphasis added). Thus, the doctrine has traditionally been applied in adjudicatory situations—that is, where the case raises issues of fact or policy within a particular factual context. For example, the Supreme Court has invoked this doctrine, *inter alia,* where the question before the court was the applicability of a particular tariff to the shipment of a certain commodity,[5] interpretation of a specific collective bargaining agreement,[6] and alleged violations of the antitrust laws.[7] In each case, a specific determination of fact or policy was required.

In contrast to these traditional examples of the use of the doctrine of primary jurisdiction, the district court in the instant case held that the doctrine applied in a situation calling not for an adjudication but rather for legislative or rulemaking activity. Appellants here make no specific complaints about the activity or omissions of Delta Air Lines; instead, they appear to be seeking a broad form of relief which amounts to legislation by injunction, initially limited to one carrier but expected and intended to have sweeping effects on the entire industry. There is no immediate issue of fact or policy to be resolved here, only a demand for a "statement of general or particular applicability and *future effect*," 5 U.S.C. § 551(4) (1970) (emphasis added), which is more properly handled through a legislative-type procedure.

■ Although we therefore cannot find the classic doctrine of primary jurisdiction applicable in this case, we are of the opinion that the facts support the application of a doctrine *in the nature of primary jurisdiction* more strongly than many of the cases in which the traditional doctrine has been invoked. Primary jurisdiction has usually been invoked in circumstances outlined by the Supreme Court in *United States v. Western Pacific Ry.,* 352 U.S. 59, 64, 77 S.Ct. 161, 165, 1 L.Ed.2d 126, 132 (1956):

No fixed formula exists for applying the doctrine of primary jurisdiction. In every case the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation. These reasons and purposes have often been given expression by this Court. In the earlier cases emphasis was laid on the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions. *See Texas & Pacific R. Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553. More recently the expert and specialized knowledge of the agencies involved has been particularly stressed. *See Far East Conference v. United States,* 342 U.S. 570, 72 S.Ct. 492, 96 L.Ed. 576.

*See also* 3 K. Davis, *supra* at § 19.01. The traditional doctrine of primary jurisdiction thus is based on two distinct rationales: 1) the desire for uniformity of regulation; and 2) the need for an initial consideration by a tribunal with specialized knowledge. It is our opinion that both reasons for applying a doctrine *of this type are present here* to such a degree that this court must overlook the absence of adjudicatory issues and apply the general principles nonetheless.

■ First, it seems clear that Congress recognized the need for uniformity of regulation in this area when it passed the Hazardous Materials Transportation Act.[8] That statute, which became effective January 3, 1975, was intended "to broaden federal regulatory control over interstate and foreign shipments of hazardous. materials

---

**5.** *United States v. Western Pacific R.R.,* 352 U.S. 59, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956).

**6.** *Order of Ry. Conductors v. Pitney,* 326 U.S. 561, 66 S.Ct. 322, 90 L.Ed. 318 (1946).

**7.** *See generally* 3 K. Davis, Administrative Law Treatise § 19.06 (1958).

**8.** Act of January 3, 1975, Pub.L. No. 93–633, Title I, 88 Stat. 2156, *codified as* 49 U.S.C. §§ 1801–12 (1974 Supp.).

by rail and other transportation modes." [9] Section 105 of the Act provides

The Secretary may issue . . . regulations for the safe transportation in commerce of hazardous materials. Such regulations shall be applicable to any person who transports, or causes to be transported or shipped, a hazardous material, or who manufactures, fabricates, marks, maintains, reconditions, repairs, or tests a package or container which is represented, marked, certified, or sold by such person for use in the transportation in commerce of certain hazardous materials. Such regulations may govern any safety aspect of the transportation of hazardous materials which the Secretary deems necessary or appropriate, including, but not limited to, the packing, repacking, handling, labeling, marking, *placarding*, and routing . . . of hazardous materials

. . . .

49 U.S.C. § 1804(a) (1974 Supp.) (emphasis added). That this provision was intended to vest in the Secretary or his delegate [10] primary authority to regulate "any safety aspects of the transportation of hazardous materials" is evident from the plain language of the statute, *supra* and the legislative history. The Senate Commerce Committee, in reporting out its version of the bill, made the following observation:

The prime difficulty, discussed by almost all of the witnesses in the June 12, 1974, hearing is that the fragmentation of regulatory power among the agencies dealing wtih [*sic*] the different modes of transportation blocks a coherent approach to the problem and creates a mass of

conflicts of jurisdiction and regulation. The problem is heightened by the fact that most shipments involve more than one mode of transportation and thus are faced with differing regulations and enforcement authorities at different stages of a trip.

S.Rep.93–1192, 93d Cong., 2d Sess. 8 (1974). Section 112 of the Senate bill, later incorporated into the Act by the conference committee,[11] specifically preempted any state or local requirement inconsistent with any requirement of the Act unless "the Secretary determines . . . that such requirement affords an equal or greater level of protection to the public than is afforded by the requirements of this Act or regulations issued under this Act and does not burden interstate commerce." S. 4057, 93d Cong., 2d Sess. § 112(a), (b) (1974).[12] In reporting out that particular section, the Senate committee stated:

The Committee endorses the principle of Federal preemption in order to preclude a multiplicity of State and local regulations and the potential for varying as well as conflicting regulations in the area of hazardous materials transportation.

S.Rep.93–1192, *supra* at 37. The conclusion to be drawn from these expressions of congressional intent is that the Hazardous Materials Transportation Act was aimed at a problem created at least in part by the existence of numerous regulatory bodies, and that it seeks to remedy this situation by consolidating the authority to regulate into one agency and thus promoting uniformity of regulation.

9. H.R.Rep.93–1083, 93d Cong., 2d Sess. 1 (1974), U.S.Code Cong. & Admin.News 1974, p. 7669.

10. Section 103(3) of the Act, 49 U.S.C. § 1802(3) (1974 Supp.), defines "Secretary" as "the Secretary of Transportation, or his delegate." On July 23, 1975, the Secretary of Transportation delegated his powers to make regulations under the Hazardous Materials Transportation Act, with minor exceptions not relevant here, to the Materials Transportation Board. Investigation and enforcement powers were delegated to various agencies. 40 Fed. Reg. 30821.

11. H.R.Rep.93–1589, 93d Cong., 2d Sess. 24–25 (1974); S.Rep.93–1347, 93d Cong., 2d Sess. 24–25 (1974). This provision became section 112 of the Act, also. 49 U.S.C. § 1811 (1974 Supp.).

12. Inasmuch as this case can be disposed of on the issue of primary jurisdiction, we express no opinion on the question of whether section 112 of the Act preempted any *common law* right of action which plaintiffs might have. We merely raise the preemption section here as an example of Congress' desire for uniformity of regulation.

Second, the nature of the instant question "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body," *Western Pacific, supra* at 64, 77 S.Ct. at 165, 1 L.Ed.2d at 132, for the trial court found that the injunctive relief requested by the appellants "involves both technical and policy questions which have industry-wide application." (J.App. 136). We cannot say that this holding is in error. In order to grant the relief that appellants seek, the court would be required to determine, *inter alia*, how much radioactivity is "significant," [13] by what means the radioactivity level must be tested, and what constitutes "adequate warning." The injunction which appellants would have the court fashion here would in effect constitute a regulation covering one phase of the interstate transportation of one group of hazardous materials on one airline. Such determinations are better made on an industry-wide basis in an agency rulemaking proceeding, and this indeed is the choice which Congress has made in enacting the Hazardous Materials Transportation Act.

Our conclusion in this respect is confirmed by the fact that there has been for the past year what is essentially an ongoing rulemaking proceeding on this general subject in which appellants have apparently never participated. The Hazardous Materials Transportation Act,[14] which became effective on January 3, 1975, directed the Secretary of Transportation or his delegate to "issue regulations . . . with respect to the transportation of radioactive materials on any passenger-carrying aircraft in air commerce." [15] The Secretary's authority in this respect is very broad, "in-

cluding, but not limited to, the packing, repacking, handling, labeling, marking, *placarding*, and routing . . . of hazardous materials . . . ." [16] Shortly after this Act took effect, the agency then in charge of the carriage of radioactive materials on passenger-carrying aircraft [17] issued a notice of proposed rulemaking on that subject. That notice stated, *inter alia*:

### PROPOSED RULE MAKING

The Federal Aviation Administration is considering amending Part 103 of the Federal Aviation Regulations to limit the carriage of radioactive materials on passenger-carrying aircraft to those intended for use in, or incident to, research or medical diagnosis or treatment and to those shipments of radioactive materials that meet requirements in 49 CFR 172 and 173 which exempt them from packaging, marking and labeling requirements for shipment by rail express and which are now exempt from the applicability of Part 103. The proposed amendments would implement section 108 of the Transportation Safety Act of 1974 (Pub.L. 93–633) in the light of views presented by interested persons at a public hearing held by the FAA on January 20, 1975 (40 FR 2607).

Interested persons are invited to participate in the making of the proposed rule by submitting such written data, views, or arguments as they may desire. . . The proposals contained in this notice may be changed in the light of comments received.

40 Fed.Reg. 5168 (February 4, 1975). Public hearings were thereafter conducted on this proposal.[18] It would have been appropriate in this rulemaking for the appellants

---

**13.** Section 108(b) of the Act, 49 U.S.C. § 1807(b) (1974 Supp.), does prohibit materials [excluding research and medical materials] emitting radiation above a specified level from being transported on passenger-carrying aircraft, and thus in a sense defines what level of radioactivity is "significant." But the further question facing the court would be, given that the only radioactive materials which can be transported on passenger flights are those which meet the section 108 standard, at what level of radioactivity must warnings be issued?

**14.** *See* note 8 *supra*.

**15.** 49 U.S.C. § 1807(a) (1974 Supp.).

**16.** *Id.* at § 1804(a) (emphasis added).

**17.** The Federal Aviation Administration.

**18.** *See* 40 Fed.Reg. 17141 (April 17, 1975), which also announces the final regulations.

to suggest that regulations be adopted for the industry similar to those which they now request be imposed on Delta Air Lines by injunction. In addition, since the authority to regulate aspects of the transportation of hazardous materials was consolidated in one agency, the Materials Transportation Board [MTB],[19] two other rule-making procedures have been initiated in which appellants' request for posted notice might have been considered.[20] The fact that appellants have not even tried to raise their issue in any of these proceedings makes this court very reluctant to accept their arguments that the agency should now be bypassed. And even if the subject of notice to passengers would not have been accepted by the MTB as properly raised in any of the foregoing proceedings, it is noted that that agency has announced a proposed general consolidation and reorganization of its existing rules,[21] and appellants could petition the agency under 5 U.S.C. § 553(e) (1970) for issuance of an industry-wide rule similar to that which they seek to impose upon Delta by injunction in this proceeding. To the extent that the response of the agency is unsatisfactory, review in federal court is available.[22]

Appellants appear to make two main arguments against use of a doctrine in the nature of primary jurisdiction in this case.

First, they cite the dissent of Justice Frankfurter in *Federal Maritime Board v. Isbrandtsen Co.*, 356 U.S. 481, 521, 78 S.Ct. 851, 873, 2 L.Ed.2d 926, 950 (1958), which states:

> It would be a travesty of law and an abuse of the judicial process to force litigants to undergo an expensive and merely delaying administrative proceeding when the case must eventually be decided on a controlling legal issue wholly unrelated to determinations for the ascertainment of which the proceeding was sent to the agency.

Appellants do not explain what "controlling legal issue" is present in this case which is "wholly unrelated" to those determinations which the Secretary or his delegate would make. As explained above, we think those determinations are integrally bound up with the legal issues in this case, and so we reject this first argument.

Second, appellants claim that use of the doctrine of primary jurisdiction would be an "empty ritual" here, "where the agency has already expressed its opinion on the precise point raised by the complaint." Appellants' Brief at 25. We disagree. Of the three incidents alleged to constitute an expression of such an opinion, two[23] took place before the enactment of the Hazardous Materials Transportation Act and thus cannot be tak-

19. 40 Fed.Reg. 30821 (July 23, 1975).

20. The Hazardous Materials Regulation Board [yet another predecessor to MTB] on June 25, 1975 solicited comments on the merits of various Hazard Information Systems, at least two of which involve placarding. 40 Fed.Reg. 26688. On September 20, 1975, the MTB extended the deadline for submission of comments in that proceeding from November 5, 1975, to February 5, 1976. 40 Fed.Reg. 44336. Also, on December 11, 1975, the MTB announced that it was considering amending its current regulations on the carriage of radioactive materials on aircraft to require aircraft operators to perform certain inspection and monitoring of radioactive materials shipments. 40 Fed.Reg. 57688. The comment period on the proposal ended February 17, 1976, long after oral argument in the present case.

21. 40 Fed.Reg. 31767 (July 29, 1975).

22. 5 U.S.C. § 706(1) (1970). *See Environmental Defense Fund, Inc. v. Ruckelshaus*, 142 U.S. App.D.C. 74, 83, 439 F.2d 584, 593 (1971); *Environmental Defense Fund, Inc. v. Hardin*, 138 U.S.App.D.C. 391, 397, 428 F.2d 1093, 1099 (1970); *Deering Milliken, Inc. v. Johnston*, 295 F.2d 856, 865 (4th Cir. 1961).

23. On Sept. 22, 1972, the Civil Aeronautics Board denied a petition for rulemaking on this subject filed by the Aviation Consumer Action Project. *See* Denial of Petition for Rule Making, CAB Docket No. 24578 (Sept. 22, 1972) [this document appears at J.App. 86–88]. The grounds for the denial were jurisdictional: responsibility to regulate this area was said to rest elsewhere. On May 4, 1973, the Federal Aviation Administration denied a similar petition on the grounds that the problem was not a serious one and that the placarding of aircraft would cause unwarranted apprehension among passengers. Denial of Petition for Rulemaking, FAA Regulatory Docket No. 12033 (May 4, 1973) [J.App. 82–85].

en to reflect current policy. The third incident is a determination by the Acting Director of the Materials Transportation Bureau [MTB] of the Department of Transportation that a regulation of the Louisiana Office of Consumer Protection requiring prior notification of passengers boarding commercial passenger-carrying aircraft of the presence of hazardous materials is inconsistent with the Hazardous Materials Transportation Act.[24]

Initially, we do not believe that determination was a clear expression of policy on the issue before this court. Although the exact provisions of the Louisiana rule are not a part of this record, it can be inferred from the MTB determination that the rule would have conflicted with the purpose of the Hazardous Materials Transportation Act by requiring warning to passengers when the aircraft carried materials regarded as "safe" under federal regulations.[25] It is not necessary to read a total rejection of the idea of passenger warnings into this determination in order to explain it. Moreover, the decision is clearly one on federal preemption and shows no intent to reject

*per se* the idea of posting passenger warnings.

In any event, we are unwilling to permit appellants to substitute a MTB decision on a particular state regulation for the record that would be developed during a rulemaking proceeding on this subject. To do so would be to "short circuit" the path mandated by Congress and leave the court without the full record of the agency's reasons for refusing to adopt such a regulation, a record which is necessary to the proper resolution of the questions appellants raise.

■ In conclusion, we hold that the trial judge properly invoked the doctrine of primary jurisdiction. The need for uniformity and a tribunal of special competence have been shown. It also appears that rulemaking is a more appropriate means of resolving the problems presented than is adjudication.[26] Therefore, we affirm dismissal of the requests for injunctive relief.[27] If appellants in the future desire to impose their suggested regulations upon any interstate common carrier of this limited category of hazardous materials, they must in the first

24. Letter of Sept. 22, 1975 from Acting Director Herbert H. Kaiser, Jr., Materials Transportation Bureau, Department of Transportation, to Charles W. Tapp, Director, Louisiana Office of Consumer Protection. [This document appears in Appendix B of the Brief for Appellee Delta Air Lines, Inc.]. It should be noted that the Louisiana regulation was not preempted, but only declared inconsistent: before preemption is decided, further proceedings are necessary to determine (1) whether the rule affords an equal or greater level of protection than the Hazardous Materials Transportation Act, and (2) whether the state rule unreasonably burdens commerce. *See* 49 U.S.C. § 1811(b) (1974 Supp.).

25. Although the Congress, in enacting [the Hazardous Transportation Act], required the removal of certain radioactive materials, it expressly provided measures to assure the safe carriage of other radioactive materials on passenger-carrying aircraft. Regulations implementing those measures are in effect. To permit a rule that would give rise to an unwarranted belief that passenger safety is jeopardized when riding in an aircraft carrying radioactive materials that are being carried in compliance with regulations would be inconsistent with the purposes of the Hazardous Materials Transportation Act and the

regulations adopted under the authority of that Act.

Letter, *supra* note 24, at 4.

26. *Adler v. Chicago & Southern Air Lines, Inc.,* 41 F.Supp. 366 (E.D.Mo.1941); *cf. Spence v. Baltimore & Ohio R.R.,* 360 F.2d 887 (7th Cir.), *cert. denied,* 385 U.S. 946, 87 S.Ct. 318, 17 L.Ed.2d 225 (1966).

27. Having determined that primary resort to the agency is required, we have the further choice of dismissing or staying the proceedings. 3 K. Davis, Administrative Law Treatise § 19.-07(2) (1970). We choose to dismiss, since the legislative nature of the remedy requested here makes it difficult if not impossible for us to grant relief without an administrative record. *Id.* An order of the Board will be subject to review in this court, but for now "[w]e believe that no purpose will here be served to hold the present action in abeyance in the District Court while the proceeding before the Board and subsequent judicial review or enforcement of its order are being pursued. A similar suit is easily initiated later, if appropriate. Business-like procedure counsels that the . . . complaint should now be dismissed. . . ." *Far East Conference v. United States,* 342 U.S. 570, 577, 72 S.Ct. 492, 495, 96 L.Ed. 576, 584 (1952).

instance request that the Secretary of Transportation or his delegate undertake a rulemaking procedure under section 105 of the Hazardous Materials Transportation Act, 49 U.S.C. § 1804 (1974 Supp.).

*Judgment accordingly.*

Supplemental Opinion on Petition
for Rehearing

ORDER

On consideration of appellants' petition for rehearing, it is

ORDERED by the court that the aforesaid petition for rehearing is denied, for the reasons stated in the following supplemental opinion filed this date.

*Per Curiam* : In connection with the petition for rehearing, we have considered the Supreme Court's recent decision in *Nader v. Allegheny Airlines, Inc.,* —— U.S. ——, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976), but find it distinguishable from the instant case. *Nader* involved a common law tort action for damages—for alleged fraudulent misrepresentation through failure to notify passengers of deliberate overbooking practices. The Supreme Court found this type of suit preserved by the saving clause of the Federal Aviation Act, and contemplated by the agency as an alternative to its "denied boarding compensation" regulation. In petitioner's case, by contrast, the damages action against Delta and Value Engineering Co. proceeds below, and has not been disturbed by our ruling. We have merely affirmed the dismissal of the action for injunctive relief against Delta, because this was an attempt to compel the court to fashion a regulation through an injunction when there is an ongoing rulemaking proceeding on the subject before the agency and petitioner has made no appearance therein. In *Nader* the Supreme Court held that the damages action for fraudulent mis-

representation was "within the conventional competence of the courts" with "the judgment of a technically expert body not likely to be helpful in the application of the standards to the facts." At ——, 96 S.Ct. 1988. In the case at bar we think it critical that the action is for injunctive relief, not damages, and in our view it does bring into play considerations of uniformity and agency expertise.[1]

*Petition for rehearing denied.*

---

1. Because of the Supreme Court's reversal of this court in *Nader,* the reference to our *Nader* opinion, 167 U.S.App.D.C. 350, 512 F.2d 527 (1975), which originally appeared following note 7 of our *Kappelmann* opinion, has been stricken today by a separate unpublished order. Since our *Nader* opinion was mentioned in *Kappelmann* solely as an example of a case where a court had asked an agency to initially decide a question of "fact or policy within a particular factual context," *supra* at 169, 539 F.2d at 165, it is no longer appropriately cited following the Supreme Court's action.